2009 Ark. App. 409

**Ketan BULSARA, Individually and as Administrator of the Estate of Simi Bulsara, Deceased, and on Behalf of the Wrongful–Death Beneficiaries of Simi Bulsara, Appellant,**

v.

**Julia Mortimer WATKINS, M.D., Appellee.**

**No. CA 07–741.**

Court of Appeals of Arkansas.

May 20, 2009.

Rehearing Denied July 1, 2009.

Wilkes & McHugh, P.A., by: Susan Nichols Estes, Deborah Truby Riordan, and Melody Piazza; Little Rock, and Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, Greenbrier, for appellant.

Kutak Rock LLP, by: Tyler McClay and J. Phillip Malcom, Little Rock, for appellee.

M. MICHAEL KINARD, Judge.

In this medical-malpractice and wrongful-death case, appellant, Dr. Ketan Bulsara, appeals from a jury verdict in favor of appellee, Dr. Julia Mortimer Watkins. Dr. Bulsara does not challenge the sufficiency of the evidence. Instead, he argues primarily that the circuit court erred by not disqualifying Dr. Watkins's attorney. As a remedy, Dr. Bulsara seeks a new trial with different opposing counsel. We find no error and affirm.[1]

On the evening of November 9, 2003, Ms. Nita Bulsara presented at St. Vincent Doctors Hospital in the early stages of labor. The obstetrician on call was appellee, Dr. Watkins, the partner in practice with Ms. Bulsara's regular obstetrician, Dr. Rosey Seguin. The two doctors practiced as the "Arkansas Women's Center." Throughout the evening, St. Vincent nurses kept Dr. Watkins apprised by telephone of Ms. Bulsara's and the baby's condition, particularly the baby's heart-rate decelerations. At 1:40 a.m., Nurse Allison Bratton asked Dr. Watkins to come to the hospital based on concerns expressed by the baby's father, appellant Dr. Ketan Bulsara, a neurosurgeon. Dr. Watkins arrived within minutes and performed an amnio-infusion procedure, which she believed stabilized the baby's heart rate. Dr. Watkins left the hospital at 3:00 a.m., and instructed

---

1. The Arkansas Supreme Court denied Dr. Bulsara's motion to certify this case.

the nurses to call her if necessary. Moments later, the baby's decelerations dropped to precipitous levels. Nurse Bratton performed several interventions but, unbeknownst to her, the baby continued to be in severe distress. Later that morning, Dr. Seguin arrived at the hospital and noted a lack of fetal activity. At 9:40 a.m. on November 10, 2003, Dr. Seguin delivered the child stillborn, due to asphyxiation by the umbilical cord.

Upon learning of the stillbirth, Dr. Watkins returned to the hospital to consult with Dr. Seguin. According to the doctors, Dr. Bulsara confronted them in a manner that led them to believe they would need legal counsel. Later that day, Dr. Watkins called attorney Phil Malcom, who had previously represented her and Dr. Seguin. On this occasion, Dr. Watkins asked Mr. Malcom to represent her, Dr. Seguin, and the Arkansas Women's Center with regard to any claims or litigation that might arise surrounding the stillbirth of the Bulsara baby. Mr. Malcom accepted representation. Thereafter, he communicated with each doctor about the events of November 10, 2003, and gave each doctor legal advice.

On April 19, 2004, Dr. Bulsara filed a medical-malpractice and wrongful-death suit against Dr. Watkins and St. Vincent Doctor's Hospital. The complaint did not name Dr. Seguin as a defendant. Mr. Malcom answered the complaint on behalf of Dr. Watkins, and he continued to act as attorney for Dr. Seguin and the Arkansas Women's Center.

In August 2004, Dr. Bulsara's attorneys attempted to schedule a meeting with Dr. Seguin. Dr. Seguin relayed the meeting request to Mr. Malcom, and he informed Dr. Bulsara's attorneys that he objected to their meeting with his client, Dr. Seguin, outside of his presence. This prompted a letter from Dr. Bulsara's attorney, Ms.

Melody Piazza, asserting that Mr. Malcom's communications with Dr. Seguin constituted improper, ex parte contact with an opposing party's treating physician, in violation of Ark. R. Civ. P. 35(c)(2) and Ark. R. Evid. 503(d)(3)(B). Ms. Piazza threatened to seek sanctions against Mr. Malcom unless he agreed to, among other things, turn over notes of his conversations with Dr. Seguin and no longer meet with Dr. Seguin outside of formal discovery. Mr. Malcom declined Ms. Piazza's requests, stating that he had been hired prior to the commencement of the lawsuit to represent both doctors.

On April 15, 2005, Dr. Bulsara filed a Motion for Withdrawal of Opposing Counsel, for Sanctions and to Prohibit Further Unauthorized, Informal, Ex Parte Contact with Plaintiff's Non–Party Treating Physician, in which he requested that the circuit court disqualify Mr. Malcom from representing "any treating physician or party to this case," citing Mr. Malcom's ex parte contact with Dr. Seguin. Mr. Malcom responded that his representation of Dr. Seguin and their ensuing confidential communications pre-dated Dr. Bulsara's lawsuit and were undertaken in response to a credible threat of litigation. Mr. Malcom also pointed out that Dr. Seguin and the Arkansas Women's Center remained vulnerable to suit because the statute of limitations had not yet run as to them. The circuit court denied Dr. Bulsara's motion. Mr. Malcom continued to represent Dr. Watkins as a defendant and to represent Dr. Seguin and the Arkansas Women's Center as potential defendants.

In November 2005, Dr. Bulsara added the Arkansas Women's Center as a defendant, which Mr. Malcom had foreseen as a possibility. The amended complaint alleged that the Center was negligent in various respects and that Drs. Watkins and Seguin provided health care to Mrs.

Bulsara and the baby in their capacity as the Center's "members, agents, partners, and/or employees." Mr. Malcom answered on behalf of the Arkansas Women's Center, but Dr. Bulsara dismissed the Center as a defendant prior to trial.[2] Thereafter, Mr. Malcom served as Dr. Watkins's attorney through nine days of trial in October and November 2006.

■ On appeal, Dr. Bulsara contends that Mr. Malcom's contact with Dr. Seguin infringed on the Bulsaras' physician-patient privilege and violated Arkansas's ban on ex parte communications with an opposing party's treating physician. At the heart of Dr. Bulsara's argument is Ark. R. Evid. 503(d)(3)(B), which reads:

Any informal, ex parte contact or communication with the patient's physician or psychotherapist is prohibited, unless the patient expressly consents. The patient shall not be required, by order of court or otherwise, to authorize any communication with the physician or psychotherapist other than (i) the furnishing of medical records, and (ii) communications in the context of formal discovery procedures.

Arkansas Rule of Civil Procedure 35(c)(2) contains similar language. Dr. Bulsara correctly points out that our supreme court has interpreted Rule 503(d)(3)(B) to prohibit a defense attorney's ex parte communication with a plaintiff's treating physician in the absence of the plaintiff's consent. See Kraemer v. Patterson, 342 Ark. 481, 29 S.W.3d 684 (2000). Here, it is undisputed that Mr. Malcom communicated with the Bulsaras' treating physician, Dr. Seguin, without the Bulsaras' consent. Even so, as we will explain, we disagree with Dr. Bulsara's argument that the circuit court should have disqualified Mr. Malcom based on those communications.

■ We begin with a discussion of physician-patient privilege. A patient has the privilege to refuse to disclose, and to prevent any other person from disclosing, his or her medical records or confidential communications made for the purpose of diagnosis or treatment of the person's physical, mental, or emotional condition. Ark. R. Evid. 503(b). Unquestionably, society has an interest in safeguarding the unique and confidential nature of the physician-patient relationship. See Harlan v. Lewis, 141 F.R.D. 107 (E.D.Ark.1992), aff'd 982 F.2d 1255 (8th Cir.1993). However, when a patient relies on his or her physical, mental, or emotional condition as an element of a claim—for instance, a claim that a physician has committed malpractice—no privilege exists as to medical records or communications relevant to the claim. See Ark. R. Evid. 503(d)(3)(A); Ark. R. Civ. P. 35(c)(1); Harlan, supra. In the present case, Dr. Bulsara made threats and accusations against Drs. Watkins and Seguin on the day that the stillbirth occurred, essentially asserting a claim of medical malpractice against them. At that point, the Bulsaras' relationship with both doctors turned adversarial. The physician-patient privilege was waived, and the doctors—having every reason to believe they would be named in a malpractice suit—understandably sought legal representation from Mr. Malcom. At that point, another closely-guarded relationship was established—that of attorney and client.

■ However, even when a party waives the physician-patient privilege, Arkansas law limits a defense attorney's access to a plaintiff's physician and requires that the attorney obtain relevant information from the physician through formal discovery rather than through informal, ex parte communications. See Ark. R. Evid.

2. Dr. Bulsara also settled with St. Vincent prior to trial.

503(d)(3)(B); Ark. R. Civ. P. 35(c)(2); *Harlan, supra.* Applying this rule, courts in Arkansas have sanctioned a defense attorney who tried to dissuade a plaintiff's treating physicians from testifying for or cooperating with the plaintiff, *Harlan, supra,* and have ruled that a defense attorney may not contact a plaintiff's treating physician after suit has been filed to inquire about hiring the physician as an expert witness. *Kraemer, supra.* Dr. Bulsara relies on these cases for reversal, but they are markedly different from the case at bar.

■ |7From the facts presented here, it is apparent that Mr. Malcom engaged in no "impermissible and unethical conduct" as did the attorney in *Harlan;* nor did Mr. Malcom seek out the plaintiff's physician to serve his own purposes, as occurred in both *Harlan* and *Kraemer.* Here, Dr. Seguin initiated contact with Mr. Malcom. Mr. Malcom's subsequent advice to and communications with Dr. Seguin were in the service of Dr. Seguin and arose in the context of their attorney-client relationship. Just as importantly, if not more so, Mr. Malcom's representation of Dr. Seguin—and his resulting communications with her—were occasioned by the Bulsaras' casting blame on Dr. Seguin and her partner, Dr. Watkins, for the stillborn child. For reasons known only to Dr. Bulsara, Dr. Watkins and the Arkansas Women's Center were named as defendants; their close associate, Dr. Seguin, was not sued. In this antagonistic situation, it is difficult to see how Mr. Malcom's communications with Dr. Seguin were detrimental to the Bulsaras' physician-patient relationship.

■ We also observe that Dr. Bulsara seeks an extreme remedy in this case—disqualification of the attorney who represented Dr. Watkins literally from day one of these events. Disqualification is a dras-

tic measure to be imposed only where clearly required by the circumstances. *Weigel v. Farmers Ins. Co.,* 356 Ark. 617, 158 S.W.3d 147 (2004). We review a circuit court's decision regarding attorney disqualification for an abuse of discretion. *Id.* A court abuses its discretion when it acts improvidently, thoughtlessly, or without due consideration. *See Chapman v. Ford Motor Co.,* 368 Ark. 328, 245 S.W.3d 123 |8(2006). Given the circumstances of this case, and the fact that the experienced circuit court judge observed the attorneys and the parties throughout this lengthy litigation, we cannot say that the judge acted thoughtlessly or improvidently in refusing to disqualify Mr. Malcom. Furthermore, Dr. Bulsara's citation to *Baylaender v. Method,* 230 Ill.App.3d 610, 171 Ill.Dec. 797, 594 N.E.2d 1317 (1992), a case with a similar fact situation, is not availing. The *Baylaender* court barred the non-party physician from testifying for the defense. The court did not take the extreme measure of prohibiting the attorney from continuing to represent the defendant doctor.

■ In this same vein, Dr. Bulsara argues that Mr. Malcom should have been disqualified because his communications with Dr. Seguin violated the Health Insurance Portability and Accountability Act (HIPAA). Dr. Bulsara raised this issue for the first time in his motion for a new trial to the trial court. Because the issue was not raised until the motion for a new trial, it was not preserved for our review, and we will not address the issue on appeal. *See Switzer v. Shelter Mut. Ins. Co.,* 362 Ark. 419, 208 S.W.3d 792 (2005).

Dr. Bulsara argues further that Mr. Malcom should have been disqualified because he could not ethically have represented both Drs. Watkins and Seguin had they each been named as defendants. On this point, it is sufficient to say that Drs.

Watkins and Seguin were not named as co-defendants.

Dr. Bulsara also claims that Mr. Malcom had a conflict of interest by asserting fault against a client of his law firm, St. Vincent, and that Mr. Malcom hired an expert witness, Dr. Charles Phillips, who had previously consulted with Dr. Bulsara's former attorney. The record demonstrates that St. Vincent ably argued its own request to have Mr. Malcom disqualified, prior to settling its case with the Bulsaras, and that the circuit court disqualified Dr. Charles Phillips as an expert.

 Dr. Bulsara's remaining arguments are collected in his brief under the heading "Further Indiscretions." He cites three instances in which Mr. Malcom allegedly "mis-managed" the litigation. First, Dr. Bulsara argues that Mr. Malcom elicited testimony from defense expert Dr. David McKelvey that the Bulsaras had settled with a third party. The exchange between Mr. Malcom and Dr. McKelvey was as follows:

MR. MALCOM: Dr. McKelvey, no matter how many times it's pitched at you, you can tell the jury, that tracing [from the heart-rate monitor] reflects the result of an amnio-infusion working, is that right, sir?

DR. McKELVEY: There's no question about it. This amnio-infusion did what it was supposed to do. There's also no question about shortly after Julia Watkins left, this baby went bad pretty quick. And, there was a tragedy here, because this baby died, and we lost this baby. Was there malpractice on Julia Watkins' fault? There was not. Why are we here? Why are you here? Why am I here? Why are all these people here? Why are you here? Basically, it's trying to find the answer; blame. What else— why else are we here? It's not over

money; there's already been a settlement in this case.

DR. BULSARA'S COUNSEL: Objection, Your Honor.

COURT: Sustained.

This transcription dispels the notion that Mr. Malcom elicited Dr. McKelvey's reference to settlement. Mr. Malcom inquired about Dr. Watkins's use of the amnio-infusion procedure, hardly an invitation to broach the topic of settlement. Furthermore, Dr. Bulsara's objection to Dr. McKelvey's testimony was sustained, and Dr. Bulsara requested no other relief. When the circuit judge mentioned Dr. McKelvey's reference to settlement during a subsequent conference on jury instructions, one of Dr. Bulsara's attorneys stated, "the court should do nothing about it at this time. There's no curative instruction. All that would do is reinforce it." Another of the Bulsaras' attorneys stated that she had not heard Dr. McKelvey's reference to settlement and that "there can't be a mistrial because I didn't hear him say it." Yet, on appeal, Dr. Bulsara argues that the circuit court should have declared a mistrial. This argument is waived. A motion for a mistrial must be made at the first opportunity. *Union Pac. R.R. Co. v. Barber,* 356 Ark. 268, 149 S.W.3d 325 (2004). Here, Dr. Bulsara not only failed to move for a mistrial at the first opportunity, he expressly rejected it as a means of relief.

Next, Dr. Bulsara argues that the circuit court should have disqualified Dr. McKelvey as a witness. Dr. Bulsara contends that he was prevented from learning the grounds for Dr. McKelvey's expert opinion, as required by Ark. R. Civ. P. 26(a)(4)(A) and *Bull v. Brantner,* 10 Ark. App. 229, 662 S.W.2d 476 (1984). We disagree. Prior to being retained as a defense expert, Dr. McKelvey investigated a State Medical Board complaint filed by Dr.

Bulsara against Dr. Watkins in late 2003 or early 2004. When Dr. Bulsara took Dr. McKelvey's deposition in 2006, Dr. McKelvey declined to describe what information he considered in conducting the Board investigation, citing the privileges conferred by Arkansas statutes. *See* Ark. Code Ann. § 20–9–503 (Repl.2005) (generally providing that proceedings and records of a peer review committee shall not be subject to discovery); Ark.Code Ann. § 16–46–105 (Repl.1999) (generally providing that the proceedings, minutes, records, or reports of medical review committees shall not be subject to discovery). Dr. McKelvey did say that he spoke to Nurse Allison Bratton during the Board investigation and that her testimony in the present case—that she called Dr. Watkins at home on the night of November 10, 2003, and that Dr. Watkins responded in a timely manner—was consistent with what she said during the Board investigation. Otherwise, Dr. McKelvey stated that, in forming his opinion that Dr. Watkins met the standard of care in this case, he did not rely on information he obtained in his Board investigation. Rather, he said that he reviewed numerous deposition summaries and exhibits, heart-monitor strips, clinic records, and the policies and procedures of the Arkansas Women's Center. Dr. McKelvey therefore disclosed the underlying data on which he based his opinion, and we see no ground for reversal.

Dr. Bulsara also argues that Mr. Malcom, in hiring Dr. McKelvey, chose a witness "who spoke with the perceived authority of the Medical Board behind him." However, the record, as abstracted, reveals no attempt by Mr. Malcom to bolster Dr. McKelvey's testimony in this manner. Dr. Bulsara further asserts that Mr. Malcom was privy to confidential information that Dr. McKelvey obtained during his investigation. Here, we note Dr. McKelvey's deposition testimony that he did not relate his findings from the Board investigation to Mr. Malcom. Under these circumstances, we find no abuse of discretion in the circuit court's refusal to disqualify Dr. McKelvey. *See Prop. Owners Improvement Dist. No. 247 v. Williford,* 40 Ark.App. 172, 843 S.W.2d 862 (1992) (applying the abuse-of-discretion standard in reviewing a circuit court's decision on whether to strike an expert witness).

Dr. Bulsara's final argument concerns the circuit court's *in limine* ruling that the parties could mention Dr. McKelvey's investigation only to the extent that Dr. Bulsara had filed a complaint against Dr. Watkins with the State Medical Board. Dr. Bulsara argues that Mr. Malcom violated that ruling by inquiring of Nurse Allison Bratton if Dr. McKelvey had ever called her and what Dr. McKelvey had asked her. Dr. Bulsara objected to Mr. Malcom's line of questioning and asked that the question be struck and the jury be instructed to disregard it. The court did as Dr. Bulsara requested. Dr. Bulsara therefore received all of the relief he requested from the circuit court and has no basis for complaint on appeal. *See Mikel v. Hubbard,* 317 Ark. 125, 876 S.W.2d 558 (1994).

Based on the foregoing, we affirm the circuit court's rulings in this case and the judgment in favor of Dr. Julia Watkins.

Affirmed.

HART and GLADWIN, JJ., agree.